GREEN v. COMPAGNIA GENERALE ITALIANA DI NAVIGATION.

(District Court, S. D. New York. July 24, 1897.)

1. COLLISION—STEAM AND SAIL—NEGLIGENT LOOKOUT—CHANGE OF COURSE—SAILS ABACK—MEAGER TESTIMONY.

The steamer O., going at the rate of 14 knots, on a course S. W. x S., ¾ S., in a clear night at sea, came in collision with the bark S., previously closehauled, on a course E. N. E., on the starboard tack, going 3–4 knots. The bark's red light was seen a little on the O.'s port bow from one to three minutes before collision; the O. ported, but just before collision saw the bark's green light, and the port bow of the bark struck the steamer's starboard side aft of the bridge; the bark shortly before had been taken aback, and while aback the steamer's masthead light was seen on the bark's starboard beam; the steamer's colored lights were not noticed; the bark regained her course, either by luffing or by wearing round, and a hail "Light Ho" was given within one minute before collision. *Held* both in fault; the steamer for negligent lookout and lack of timely measures; the bark for careless management and change of course.

2. TESTIMONY TAKEN IN PERPETUAM REI MEMORIAM—SECTION 868, REV. ST.—
SERVICE OF PROCESS NECESSARY.
   Depositions in perpetuam rei memoriam under section 868, Rev. St., cannot be taken ex parte by a proceeding in equity without any service of process upon the defendants in interest, though they are out of the country. Such depositions, taken before the libel was filed, excluded. The chancery practice stated.

Carver & Blodgett, for libelant.

Ullo, Ruebsamen & Cochrane, for respondent.

BROWN, District Judge.    The above libel was filed to recover the damages arising from a collision at sea, at about 1 o'clock in the morning of March 31, 1895, some 300 miles off the coast of Brazil, between the libelant's whaling bark, Swallow, bound north for provisions, and the respondent's steamship, Orione, bound from Genoa, Italy, to Montevideo.    The night was clear.    The Swallow was sailing slowly, closehauled on the starboard tack, making a course of about E. N. E., with the wind from the S. E., light and a little variable.    The steamer's course was S. W. x S., ³/₄ S., and she was making about 14 knots per hour.

According to the testimony of the steamer's witnesses, all taken on commission, the red light of the bark was first seen from two to three minutes before the collision, a little on the steamer's port bow.    Her helm was then put hard a-port (hard a-starboard in foreign phrase) so that the steamer's head turned gradually to starboard.    The bark's red light continued to be seen until very shortly before the collision, when the green light appeared, and a few seconds thereafter, the port bow of the Swallow struck the port side of the steamer, a little aft of the bridge, and about 140 feet from her stem.    The Swallow was damaged along her port side for some distance aft of the cathead.    She subsequently reached Rio Janeiro where she was repaired.    The steamer was not seriously injured.

The only witnesses from the bark that have been examined since the filing of the libel were Roudet, the fourth mate, and Da Lomba, who were on deck before the collision, and also the master, who did not reach the deck until a few moments after the collision.    Roudet says that the masthead light of the steamer was seen 15 minutes before collision, several miles away, two points off the starboard beam, afterwards ahead, a little on the port bow, and just before collision on the starboard bow; that no change of course was made by the bark, and that she was struck by the steamer a glancing blow on the port bow, springing her mainmast and foremast.    The colored lights of the steamer he did not notice at all.

It is plain that this does not account for the collision.    To have the steamer's light two points aft of the bark's starboard beam, the bark must have been heading about west, and if the bark did not change her course thereafter the collision could not have happened.

The answers by the respondent's witnesses, in the depositions, are extremely brief and meager; and though her porting hard naturally agreed with seeing the red light on the port bow, and this harmonizes with Roudet's statement, there is no explanation why the bark's lights, either red or green or both, were not seen earlier from

the steamer; nor why a port light seen on her port bow should not have been avoided, if she hard a-ported, as she states, even two minutes before collision; since in that interval, as she was going at 14 knots speed, she must have changed her heading at least six points; and it is impossible that the bark, going slowly, could by any slight change, after her red light was visible, have thwarted the effect of a change of six points by the steamer going 14 knots.

The cross-examination of Roudet, however, shows that the bark did not keep her course from the time the steamer's light was first seen; he says that when that light was seen the bark had been taken aback so that the light was seen aft of a-beam, or on the starboard beam; that after about 10 minutes maneuvering, during which time the bark was drifting backward, she regained her course of about E. N. E., so as to bring the steamer's light ahead or on the starboard bow. He states indeed that this was 15 minutes before the collision, but he also says that he reported "A light, Ho." The captain who was below heard this hail, and in a few moments came to the companion way, as he says, and directed the vessel to be kept close to the wind, then went back to his room, and before he had time to put on his trousers fully, the collision happened. This would indicate that the report of the light was less than a minute before collision, instead of 15 minutes; and that the change of the steamer's masthead light from the bark's port bow to her starboard bow was some time during this period of a minute before collision.

This agrees with the respondent's testimony. For such a change of lights, considering that the blow was on the bark's port bow, and that the steamer was crossing the bow of the bark at the moment of collision, from starboard to port, and that the contact with the steamer was aft of the bridge, could only have arisen from the bark's change by some swinging to port. The witness says that the masthead light, when reported, was one-half a point on the lee bow, and that that was the starboard bow; it was really the port bow. He had previously said that he first saw the steamer's masthead light, 15 minutes before the collision, two points off the starboard beam. On cross-examination he says the steamer's light was seen about a mile off, and two points off the lee beam, but that it did not remain on the beam as the bark had caught aback; that she kept sagging astern; that the main sail caught full again, and set the vessel ahead, and in about 15 minutes she had caught her course again. His testimony has many contradictions in detail. On redirect he again says the bark was aback when he first saw the steamer's light; that the bark kept sagging astern all the time; that then the main sail filled, and the vessel took its course, and that then the steamer bore right straight ahead; and that it was about 15 to 17 minutes from the time he first saw the steamer's light until the vessel came up to her course, and that she was aback 10 minutes.

The witness Da Lomba adds nothing trustworthy to the case. He says he saw the masthead light about a mile away 15 minutes before the collision; that the bark did not change her course at all; and he says nothing about her being taken aback. He also says it was 15 minutes from the hail "Light Ho," until the collision (which cannot

be correct) and he did not see any colored lights and did not look for them, but thinks the steamer's masthead light that he saw was red.

Upon this testimony on the bark's part, indefinite and confused as it is, there can be no doubt of great negligence both in her navigation and in the watch and report of the lights of the steamer. That she was taken aback, and went astern, and that she was a considerable time in getting on her course again must be deemed proved. It is not definitely stated whether she got back to her course again by luffing, which from the expressions "sagging" and "drifting back," I at first supposed was the case, or by wearing round. Roudet's statement that the steamer's light was first seen two points aft of the starboard beam, would indicate wearing round, and that the bark was then heading about west. No questions were asked the witness sufficient to explain the ship's behavior.

Upon such uncertainty and contradictions in the testimony in the libelant's behalf, and such obvious negligence in the management of the bark, no decree against the steamer would be warranted, if her own testimony gave a reasonable and probable explanation of the collision, and showed reasonable diligence and caution on her part. But the case shows that she must have kept a negligent lookout, or the bark's lights must have been seen much earlier, whether the bark regained her course of E. N. E. by luffing or by wearing round. In the former case, the bark's red light must have been visible from five to ten minutes before collision, and the bark's change of position, though constant and deceptive, must have been comparatively very slow, and could not have been sufficient to prevent the steamer from avoiding her, had timely notice been taken of the bark and had the steamer hard a-ported even a minute before collision, as a drawing of the situation will show. If the bark wore round, her red light could not have been seen till one or two minutes before collision, and her green light must have been visible for at least five minutes preceding; or else, if the bark regained her course of E. N. E., several minutes before collision, her previous changes in wearing round were immaterial. Upon the testimony so far, my conclusion, therefore, is that the steamer was negligent in lookout and in timely measures to avoid the bark; and that the bark was still more negligent in her management, as the signal, "Light Ho," just before collision proves, this signal being given so late probably from the fact that no attention was previously paid to the steamer, because of the endeavors of all on deck to bring the bark back to her course; and that upon all these circumstances, the steamer's testimony that just before collision the bark again changed sufficiently to show her green light, even though she had regained the course of E. N. E., several minutes before, ought not to be discredited, and that the bark, therefore, contributed to the collision by bad management and changes of course.

Besides the testimony above referred to, the libelant has offered in evidence four depositions of other seamen who were on board the bark, which were taken under section 866 of the Revised Statutes in the circuit court of Massachusetts in perpetuam rei memoriam in August, 1895, about three months before the present libel was filed. The reason for taking this testimony was, that the seamen were about

to depart on distant voyages and it was improbable that their testimony could be procured when wanted; the present respondent, being a foreign corporation and having no property in this country, it was impossible at that time to acquire jurisdiction by the filing of any libel either in rem or in personam, so that the depositions of the witnesses might be taken as in ordinary cases in the principal suit. For the same reason no service of process could be made upon the defendant, or any appearance obtained in the suit in equity to take the testimony in perpetuam rei memoriam. Accordingly, the proceeding to obtain the depositions was taken by petition, which was filed in Massachusetts on the 16th of August, 1895, setting forth the above facts, whereupon an order was entered ex parte for the taking of these depositions on the 20th day of August, before a notary public at New Bedford, the same to be returned and filed of record in the circuit court of Massachusetts.

The examination of witnesses was accordingly taken ex parte before the notary public named on the 20th day of August, and on the 23d of August the depositions were returned and filed in the office of the clerk of the circuit court of Massachusetts; and on the 31st of August a decree was entered in that court adjudging that said depositions should remain in perpetuam rei memoriam, to be used in case of the death of any of the witnesses, or their inability to attend on the trial of any suit for the collision damages.

The depositions thus taken were six in number, two of them being those of Roudet and Da Lomba who were subsequently examined as witnesses under the present libel. The other four witnesses could not now be found, so as to be produced and examined as witnesses in this action, and their depositions in the equity proceeding are offered in evidence, to which objection is made that they are incompetent. I am of the opinion that the objection must be sustained. The depositions were evidently not taken "according to ordinary usage" under the first clause of section 866 of the Revised Statutes. They can only come in, if at all, under the second clause of that section, which provides that:

"Any circuit court, upon application to it, as a court of equity, may, according to the usages of chancery, direct depositions to be taken in perpetuam rei memoriam, if they relate to any matters that may be cognizable in any court of the United States."

Giving to this clause its widest possible scope, as including any matter that may thereafter become a subject of litigation, the proceeding according to the express limitation of the statute must be "according to the usages of chancery." This provision is substantially the same as was enacted in the judiciary act of 1789. 1 Stat. 90, § 30. The "usages" referred to are evidently those of the English chancery, no different chancery practice being then or since established here, in that regard. Counsel have not referred me to any authority, however, nor have I been able to find any, for proceeding in equity under any circumstances by mere ex parte petition to take depositions in perpetuam rei memoriam, without any bill filed, or process issued or served on the defendants in interest. The subject is treated with some fullness in the principal works on chancery prac-

tice. They all require the filing of an original bill and the service of process in the usual manner upon the defendants interested. It is the right of the defendants to defeat, if they can, the complainant's claim to take such depositions, and to cross-examine the witnesses if the taking of depositions is allowed. The form of the prayer of the bill is the same as in ordinary bills, excepting the requirement that the defendants abide the decree of the court. See Hughes, Eq. Draftsm. (Am. Ed.) pp. 360–362. Story, Eq. Pl. §§ 299–306; 2 Daniell, Ch. Pl. & Prac. 1572–1574; Fost. Fed. Prac. § 279; Langd. Eq. Pl. §§ 201, 202. Ordinarily the complainant cannot proceed to take depositions at once. The defendant has 14 days in which to show cause against proceeding to take the depositions, and if sufficient cause is shown against it, the complainant is not allowed to proceed. 1 Madd. Ch. Prac. 187; Com. Dig. 471; Hughes, Eq. Draftsm. p. 361. Ordinarily, moreover, the defendant must answer before the testimony is taken; but if after being served with process he refuses to answer or absconds, the depositions have been allowed to be taken on those facts being proved. Lancaster v. Lancaster, 6 Sim. 439. This was allowed by Lord Eldon in the case of Frere v. Green, 19 Ves. 319, where he observed:

"There is no instance of such an examination before appearance, except after service of subpoena; and then, there being no appearance, the court, holding the defendant to be in contempt, has granted the examination."

This seems to be the utmost extent of the allowance of ex parte depositions, viz: where the defendants have been duly served with process, and have thereafter refused to plead, or absconded. As there was no process served in this case, nor any legal notice given to the defendants, I am obliged to exclude these depositions as irregular, and not "according to the usages in chancery." If such ex parte depositions could be thus taken, and afterwards brought into actions subsequently begun, much of the testimony in admiralty causes would naturally be taken in this way, and cross-examination, that necessary safeguard of the truth, would be lost.

Though I must exclude these depositions, therefore, as evidence in the action, I have nevertheless looked into them for the purpose of seeing, whether, regarding them merely as affidavits, they furnish a sufficient ground for a continuance of the cause, considering that the evidence on both sides is so meager and unsatisfactory. Roudet there states that he first saw the light of the steamer off the starboard beam, a little bit forward of the beam. When he saw it next, it was right straight ahead. Explaining this he says, "Our vessel caught aback, and in getting on our course again, and in catching the steamer, it was right dead ahead again, a little off the port bow."

Da Lomba says the first time he saw the light it was on the weather beam; next, right dead ahead. "The bark," he says, "was sailing by the wind, and sometimes she would fall off, and sometimes she would come up, and her sails were taken aback, and that caused her to go clear round in a circle to get on her course again, and while she was going round in a circle I saw this steamer's light on our starboard beam, and when she got on her course again, the steamer's light was almost dead ahead, a little on the port bow." Nothing of

this appears in Da Lomba's testimony taken in the present cause. Roudet says he saw the masthead light "two points on our starboard bow about five miles away, fifteen minutes before the collision, that the vessel was all the time on the starboard tack." He says nothing there of being taken aback. McComba, third mate, who was in charge of the navigation at the time of the collision, says he first saw the steamer's light ·off the starboard beam, 20 minutes or a half hour before the collision, while sailing on a course N. E. ½ E. closehauled, and that the light continued to appear upon the port bow (an impossible account). Explaining this he says, "that they were sailing by the wind closehauled, and that the wind was baffling, and the wind caught the sails aback, and she swung right around; that she went right around in a circle, the whole length of her, until she came round on her course again, and that she had not come on her course fully when he first saw the steamer's light, being then about eight points off her course." He says that the course N. E. ½ E. was regained in three or four minutes and that the steamer's light then bore a little on the port bow; that he saw the white light and the two side lights on the steamer about ten minutes before the collision, when she was two or three miles away; that the lights bore on the port bow all the time, and that the course of the bark was not changed. Pease, chief officer, states that he was below at the time of collision, but that he was on deck about ten minutes before, and saw the steamer's masthead lights and two side lights very near, two points off the lee bow. His subsequent testimony indicates that that was much less than ten minutes before the collision. Taber the second officer was below.

From this brief reference to the depositions excluded, it is evident that the testimony of these witnesses, even as the depositions stand and without any of the results of cross-examination, would contribute nothing to relieve the bark from the charge of bad management, but would plainly confirm it; the inconsistencies in the bark's testimony are repeated in these depositions, so that it would remain impossible to give credit to any precise details of their evidence to exempt the bark from blame; it shows a change of course of at least eight points after the steamer's light was first seen, and confirms the steamer's story that the bark's port light was shown and the evident failure of the bark to pay any attention to the steamer until just before collision. There is nothing sufficient to discredit the steamer's evidence of a change by the bark so as to show her green light just before collision. This might have happened through too strong a checking of a previous swing to starboard, or. a purpose to prevent being taken aback again.

Decree for the libelant for one-half the damages.